UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEMUEL SMITH, | X : |
| *Plaintiff*, | : |
| | : |
| - *v.* - | : |
| | : **COMPLAINT** |
| ANTHONY J. ANNUCCI, Acting Commissioner, | : |
| Department of Corrections and Community | : |
| Supervision, JAMES O'GORMAN, Deputy | : 18-cv-6261 |
| Commissioner for Correctional Facilities, | : |
| Department of Corrections and Community | : |
| Supervision, JOSEPH BELLNIER, Former Deputy | : |
| Commissioner for Correctional Facilities, | : |
| Department of Corrections and Community | : |
| Supervision, JOHN and JANE DOES 1, Guidance | : |
| Counselors, Five Points Correctional Facility, JOHN | : |
| and JANE DOES 2, Security Supervisors, Five | : |
| Points Correctional Facility, JOHN and JANE DOES | : |
| 3, Committee Chairpersons, Five Points Correctional | : |
| Facility, JOHN and JANE DOES 4, Staff-Inspectors | : |
| General, Five Points Correctional Facility, JOHN and | : |
| JANE DOES 5, Staff Counsel, Five Points | : |
| Correctional Facility, JOHN and JANE DOES 6, | : |
| Chairpersons Facility Operations, Five Points | : |
| Correctional Facility, *each in their official and* | : |
| *individual capacities.* | : |
| | : |
| *Defendants*. | : |
| | X |

Plaintiff LEMUEL SMITH (hereinafter "Plaintiff" or "Mr. SMITH"), by his counsel

McLAUGHLIN & STERN, LLP, as and for his Complaint against Defendants ANTHONY J.

ANNUCCI, Acting Commissioner, Department of Corrections and Community Supervision

("DOCCS"); JAMES O'GORMAN, Deputy Commissioner for Correctional Facilities, DOCCS;

JOSEPH BELLNIER, Former Deputy Commissioner for Correctional Facilities, DOCCS; JOHN

and JANE DOES 1, Guidance Counselors, Five Points Correctional Facility; JOHN and JANE

DOES 2, Security Supervisors, Five Points Correctional Facility; JOHN and JANE DOES 3,

Committee Chairpersons, Five Points Correctional Facility; JOHN and JANE DOES 4, Staff-Inspectors General, Five Points Correctional Facility; JOHN and JANE DOES 5, Staff Counsel, Five Points Correctional Facility; JOHN and JANE DOES 6, Chairpersons Facility Operations, Five Points Correctional Facility; each in their official and individual capacities (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This is a civil rights action for injunctive and declaratory relief, as well as compensatory and punitive damages, pursuant to 42 U.S.C. § 1983 et seq. ("Section 1983") for violations of Mr. SMITH's due process rights under the Fourteenth Amendment to the United States Constitution and right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

2.      Mr. SMITH, a 76-year old incarcerated individual, has been and continues to be kept under conditions of extreme isolation and restricted movement for nearly 37 years, in the Special Housing Unit ("SHU") of New York State's prisons, also known as "solitary confinement," and, for the past 22 years, in Administrative Segregation ("Ad Seg") status.[1]

3.      Mr. SMITH, who is currently at Five Points Correctional Facility in Romulus, New York ("Five Points"), spends approximately 23 to 24 hours each day, every week, sedentary in a single-occupancy cell. Social interactions are nearly nonexistent for Mr. SMITH. This prolonged isolation and sedentary confinement has hastened the deterioration of Mr. SMITH's physical and mental health.

---

[1]      As discussed, *infra*, Mr. SMITH was removed from general population to Disciplinary Segregation for 15 years beginning in 1984 through 1996, and has remained confined indefinitely in Administrative Segregation since 1996.

4.      Although Mr. SMITH is statutorily entitled to a review every 60 days to determine whether his continued confinement in Ad Seg serves a legitimate purpose and is warranted, since his initial confinement in 1981 through the present, Department of Corrections and Community Supervision ("DOCCS") staff have and continue to habitually rubber-stamp arbitrary and unsupported reviews that recommend Mr. SMITH's continued confinement in Ad Seg indefinitely.

5.      The Defendants, who review those recommendations and are ultimately responsible for deciding whether Mr. SMITH is or is not released back into the facility's general population have, time and again, decided to keep him in indefinite isolation on the pretext that he "may" pose a threat to female staff or visitors, and further, to "serve as an example" to other prisoners. Moreover, since September 2016, Mr. SMITH has received only two complete reviews—a third review was not signed by the entire three-member committee and, despite not having complete approval from that committee, was approved by Central Office.

6.      Mr. SMITH was first confined to Ad Seg in 1981 when he was accused of killing a female correction officer. During the pendency of the criminal action, Mr. SMITH remained in Ad Seg and, for a brief period of time, was placed in Individual Protective Custody. After having been criminally charged with the murder, and after the Court of Appeals ruled the death penalty inapplicable to Mr. SMITH, he was charged internally and given a prison disciplinary hearing at which he received a disciplinary disposition of 15 years continued confinement in solitary.

7.      During the 15 years Mr. SMITH served his disciplinary disposition, he received few minor infractions, but when it came time for him to be released back into general population in 1996 the Deputy Superintendent recommended that he continue to serve his sentence in isolation indefinitely.

8.     In the July 1998 issue of *DOCCS Today*, then-Commissioner Glenn Goord admitted that Mr. SMITH's placement in Ad Seg was a pretext for indefinite confinement when he stated: "Lemuel Smith will remain locked up for as long as I am Commissioner." Each subsequent Commissioner has continued to hold Mr. SMITH in Ad Seg to further extend his punishment.

9.     The Defendants' overt acts in depriving Mr. SMITH meaningful, periodic review of his administrative segregation status have guaranteed him an indeterminate sentence in extreme and detrimental isolation, which has and will continue to affect his physical and mental well-being.

10.    With knowledge of the effects of the conditions of his confinement in Ad Seg, Defendants are exacting a punishment in excess of what has already been imposed and served. In the Defendants' own words, Mr. SMITH remains confined to Ad Seg not because of a legitimate concern for safety—as that concern is belied not only by his physical impediments, but also his daily interactions with facility staff, including medical staff, and corrections officers—rather, because Defendants want Mr. SMITH to "serve[] as an example" and a "reminder" to other prisoners of the extent to which they can levy cruel and disproportionate punishment on them.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343, by virtue of claims under Section 1983 and the Fourteenth and Eighth Amendments, and to order declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

12.    Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), in that, for purposes of this section, a substantial part of the events constituting Plaintiff's claims have taken place within this judicial district.

**PARTIES**

13.     Plaintiff LEMUEL SMITH is a 76 year-old incarcerated individual at Five Points Correctional Facility ("Five Points") in Romulus, New York. Mr. SMITH was transferred to Five Points on March 31, 2008 from Elmira Correctional Facility, located in Elmira, New York. For 37 years, Mr. SMITH has been confined to solitary and kept in extreme isolation from the general population. At all relevant times, Mr. SMITH has been confined in a facility under the direction of DOCCS, including, but not limited to, Great Meadow Correctional Facility, Attica Correctional Facility, Elmira Correctional Facility, and presently, Five Points.

14.     Defendant ANTHONY ANNUCCI is the Acting Commissioner of DOCCS, and has been since approximately April 2013 to the present. He is responsible for the operation and administration of all facilities within the department and the adoption of policies and procedures for the operation of such facilities. Defendant ANNUCCI is a person under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and is sued in his official and individual capacities.

15.     Defendant JAMES O'GORMAN is the Deputy Commissioner for Correctional Facilities for DOCCS, and is responsible for the overall management and operation of the correctional institutions within DOCCS. His responsibilities include reviewing and approving periodic reviews for an incarcerated individual's continuation in, or removal from, Ad Seg. Defendant O'GORMAN is a person under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and is sued in his official and individual capacities.

16.     Defendant JOSEPH F. BELLNIER was the Deputy Commissioner for Correctional Facilities for DOCCS from approximately 2011 until his retirement in or about September 2017.

He was responsible for the overall management and operation of the correctional institutions within DOCCS. His responsibilities included reviewing and approving periodic reviews for an incarcerated individual's continuation in, or removal from, Ad Seg. Defendant BELLNIER is a person under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and is sued in his official and individual capacities.

17.    Defendants JOHN and JANE DOES 1 are the current and former Guidance Counselors for Five Points. As Guidance Counselors, defendants JOHN and JANE DOES 1 are current and former members of the Facility Review Committee who have and continue to recommend Mr. SMITH's prolonged placement in indefinite confinement. Defendants JOHN and JANE DOES 1 are persons under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and are sued in their official and individual capacities.

18.    Defendants JOHN and JANE DOE 2 are current and former Security Supervisors for Five Points. As Security Supervisors, defendants JOHN and JANE DOE 2 are current and former members of the Facility Review Committee which who have and continue to recommend Mr. SMITH's prolonged placement in indefinite confinement. Defendants JOHN and JANE DOE 2 are persons under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and are sued in their official and individual capacities.

19.    Defendants JOHN and JANE DOE 3 are current and former Committee Chairmen for Five Points. As Committee Chairman, defendants JOHN and JANE DOE 3 are current and former members of the Facility Review Committee who have and continue to recommend Mr. SMITH's prolonged placement in indefinite confinement. Defendants JOHN and JANE DOE 3 are persons under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and are sued in their official and individual capacities.

20.     Defendants JOHN and JANE DOE 4 are current and former Staff Inspectors General for Five Points. As Staff Inspectors General, defendants JOHN and JANE DOE 4 are current and former members of the Central Office Committee which, under the direction of the Deputy Commissioner for Correctional Facilities, considers the Facility Committee Report and further recommends Mr. SMITH's continued placement in indefinite confinement. Defendants JOHN and JANE DOE 4 are persons under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and are sued in their official and individual capacities.

21.     Defendants JOHN and JANE DOE 5 are current and former Staff Counsel for Five Points. As Staff Counsel, defendants JOHN and JANE DOE 5 are current and former members of the Central Office Committee which, under the direction of the Deputy Commissioner for Correctional Facilities, considers the Facility Committee Report and further recommends Mr. SMITH's continued placement in indefinite confinement. Defendants JOHN and JANE DOE 5 are persons under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and are sued in their official and individual capacities.

22.     Defendants JOHN and JANE DOE 6 are current and former Chairpersons Facility Operations at Five Points. As Chairmen Facility Operations, defendants JOHN and JANE DOE 6 are members of the Central Office Committee which, under the direction of the Deputy Commissioner for Correctional Facilities, considers the Facility Committee Report and further recommends Mr. SMITH's continued placement in indefinite confinement. Defendants JOHN and JANE DOE 6 are persons under 42 U.S.C. § 1983, and at all times alleged herein acted under color of law, and are sued in their official and individual capacities.

## FACTS COMMON TO ALL CAUSES OF ACTION

***A. Background of Mr. SMITH's Confinement to SHU and Placement on Ad Seg***

23.     Mr. SMITH was first confined to SHU in 1981 on pre-hearing disciplinary status, when he was accused of killing a female correction officer at Green Haven Correctional Facility. Prior to any conviction, Mr. SMITH was transferred to Downstate Correctional Facility and then returned to Green Haven Correctional Facility, before eventually being placed in isolation at Great Meadow Correctional Facility pending a Tier III Disciplinary hearing.

24.     Mr. SMITH was finally given a disciplinary hearing in 1984, after the Court of Appeals determined that the death penalty was inapplicable to Mr. SMITH for his conviction. After the close of the disciplinary hearing, Mr. SMITH received a disposition that required him to serve 15 years in SHU.

25.     During the time he was confined in SHU serving his disciplinary punishment, Mr. SMITH had only a few minor, nonviolent incidents. In those 15 years of confinement in SHU, Mr. SMITH received three disciplinary tickets—once for possessing contraband and twice for refusing a direct order, each in 1989, 1990, and 1993 respectively.

26.     Mr. SMITH expected to return to general population on September 11, 1996, having served his 15-year disciplinary sanction. However, in or about September 1996, then-Deputy Superintendent for Security J. Burge recommended that a hearing be conducted to keep Mr. SMITH in SHU on Ad Seg status. The recommendation speculated that Mr. SMITH's "assignment to General Population would pose a distinct, serious threat to the life or safety of any female employee," based solely on the crimes for which Mr. SMITH had previously been convicted.

27.     The Commissioner's Hearing Officer, L. Bates, considered statements, testimony, and documentary evidence to determine whether Mr. SMITH should continue to be confined in isolation on Ad Seg status. The Hearing Officer conceded that Mr. SMITH had had no disciplinary incidents since 1989, and no incidents prior to then sufficient to hold him in Ad Seg further.

28.     In addition, the Deputy Superintendent for Programs, a chaplain, psychologists, sergeants, and counselors all testified that they had been in the presence of Mr. SMITH in a non-secure room and never felt threatened by him. Deputy Superintendent J. Burge also testified that Mr. SMITH had been a model prisoner.

29.     At the close of the hearing, however, the Hearing Officer found that Mr. SMITH's continued confinement in isolation was recommended based on the nature of the aforementioned crimes.

30.     Since then, Mr. SMITH has remained confined indefinitely in conditions of extreme insolation, with no genuine path toward a return to general population, as a means of exacting an unrelenting punishment and, in the Defendants' own words, to use Mr. SMITH as a "reminder" to other prisoners.

**B.  Defendants' Failure to Provide Meaningful and Timely 60-Day Reviews**

31.     Once a prisoner is placed in Ad Seg for an indefinite term, he is entitled to periodic "reviews" of his placement, pursuant to 7 N.Y.C.R.R. § 301.4, every 60 days by a three-member committee.

32.     By regulation, the reviewers are to examine the prisoner's institutional record and write a report setting forth: "(i) reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude;

and (iii) any other factors they believe may favor retaining the inmate in or releasing the inmate from administrative segregation."

33.     Defendants' recommendations for Mr. SMITH's continued confinement in Ad Seg have, since 1996, cited nearly verbatim in each review that the reasons for his placement in Ad Seg are because of his past convictions—in particular, for the death of the female correction officer—as well as crimes of a related nature for which Mr. SMITH has not been convicted.

34.     Defendants base their recommendation to continue Mr. SMITH's confinement in Ad Seg on their belief that continued confinement will reduce and/or eliminate Mr. SMITH's "ability" to pose a threat to female staff or visitors, despite the fact that he has not posed an actual threat to any female staff or visitors in his interactions with them throughout 37 years of confinement.

35.     Defendants also base their recommendation to continue Mr. SMITH's confinement in Ad Seg on the premise that his confinement in isolation is a "reminder to inmates," apparently viewing his continued isolation as a deterrent to other prisoners who might think about engaging in misconduct.

36.     Notwithstanding the foregoing, Defendants have repeatedly noted that Mr. SMITH's disciplinary record while in Ad Seg is substantially clean. Each Ad Seg review notes that Mr. SMITH has presented no behavioral problems other than a minor incident with a suspended disposition in May 2008 for possessing property in an unauthorized area; a minor incident on March 21, 2013, for refusing a direct order; and most recently, in December 2016, for attempting to send drawings of his cell to his attorneys.

37.     In or about 2012, Mr. SMITH was approved for incentives for Ad Seg individuals as part of the Administrative Segregation Incentives Program, which included video viewing time,

the ability to purchase certain food items from the Commissary four times per week, an additional visit per week, a personal pair of sneakers, shorts, and sweatpants, and a monitored telephone call once per week. However, in or about February 2017, the program was discontinued, without explanation, and the Progressive Inmate Movement System ("PIMS") was instituted for all As Seg individuals. All of Mr. SMITH's prior incentives were, without explanation, stopped.

38.     As a result of the discontinuation of the Administrative Segregation Incentives Program, Mr. SMITH has no longer been afforded time out of his cell, video viewing time, the additional visit per week, sneakers, shorts or sweatpants. Further, Mr. SMITH's telephone calls have since been limited to 15 minutes, and his Commissary privileges were reduced to $5.00 per month. The so-called privileges afforded to Mr. SMITH in PIMS are tantamount to those provided to individuals placed in Disciplinary Segregation.

39.     Despite Mr. SMITH's nonviolent behavior, Defendants continue to deny Mr. SMITH release from Ad Seg, or placement in any other controlled unit that may provide rehabilitative programming or additional time out of his cell.

40.     Mr. SMITH is provided with no information about any demonstrable path out of Ad Seg, and Defendants have not informed him of any way that he can genuinely hope to seek and gain release from Ad Seg.

41.     By failing to recognize Mr. Smith's exceptional disciplinary record, relying on misbehavior that occurred over 37 years ago, and failing to provide Mr. Smith with any guidance as to what he could do to gain his release from Ad Seg, Defendants have denied Mr. Smith a meaningful review of his administrative segregation status.

42.     Further, Defendants consistently fail to provide Mr. SMITH with a 60-day review in a reasonable amount of time after it was made, or they fail to provide him with a 60-day review

entirely. In doing so, Defendants have deprived Mr. SMITH of an opportunity to dispute any factual evidence or to provide information relating to his ongoing isolated confinement that is the basis for their review.

43.     Defendants' practice of denying Mr. SMITH a meaningful review of his Ad Seg status operates as a cruel hoax furthering the hopelessness and despair he experiences in Ad Seg, and further leads him to believe that there is no way out of Ad Seg.

44.     Defendants' recommendation that Mr. SMITH be retained in Ad Seg to purportedly reduce and/or eliminate his ability to pose a threat to female staff or visitors, despite the fact that Mr. SMITH has exhibited on countless occasions his ability to interact with female staff and visitors without posing a threat and without incident, is arbitrary and capricious.

45.     Moreover, Defendants' use of Mr. SMITH's confinement in isolation in Ad Seg as a means to serve as a "reminder to inmates and staff" is itself cruel and unusual, and serves no relationship to Mr. SMITH's personal confinement in Ad Seg.

**C.  The Inhumane Conditions and Limitations of Mr. SMITH's Confinement**

46.     Despite having served his 15-year disciplinary punishment, since 1996 Defendants have continued to confine Mr. SMITH in extreme isolation in Ad Seg to the detriment of his physical and mental health, and with the knowledge that Mr. SMITH poses no risk to others.

47.     The conditions of Ad Seg are such that Mr. SMITH is completely denied work, vocational, educational, programming, cultural, and social opportunities, and is severely restricted in recreational opportunities and access to personal property.

48.     Mr. SMITH is kept under extraordinary levels of surveillance and control, and has extremely limited contact with family or loved ones.

49.     Mr. SMITH, like others in Ad Seg, has absolutely no access to group recreation, group education, group prayer, or group meals.

50.     For approximately 24 hours each day, Mr. SMITH is confined by himself to his cell, which measures approximately 13 feet long by 10 feet wide.

51.     Mr. SMITH's movement is exceptionally restricted, not only because of the size of his cell, but because he is bound to a wheelchair. As a result of this, Mr. SMITH is sedentary nearly 24 hours each day, every week.

52.     Mr. SMITH's cell has concrete walls and contains a bunk made of steel, a sink, a toilet, a shower, and a desk. The cell is outfitted with guardrails that Mr. SMITH has to use to lift himself onto the toilet or into the shower, as well as assist him in and out of bed.

53.     Mr. SMITH's cell has only one small window that faces a recreational "cage" built out from behind the cell itself. This cage is accessible through a door, and is comprised of two concrete walls on each side, a concrete roof, and a wire fence. Notwithstanding the purpose of this cage, Mr. SMITH is unable to move about it freely or engage in any form of exercise because of his deteriorated physical state.

54.     Mr. SMITH's cell is located in 12 Block, where no general population prisoner is allowed. Also housed in 12 Block are prisoners in Involuntary Protective Custody or placed on Disciplinary Segregation.

55.     Mr. SMITH's cell was, until recently, located near the "strip cell," where prisoners who are at risk of suicide, or purportedly suffer from mental illness, are temporarily held. Mr. SMITH was regularly subjected to their screaming, outbursts, and banging.

56.     Due to Mr. SMITH's physical limitations, he requires the use of a porter to clean his cell. The porter responsible for cleaning Mr. SMITH's cell does so on Saturdays, but not regularly, and Mr. SMITH is otherwise unable to clean substantially on his own.

57.     Mr. SMITH is given two hours a day for so-called "recreational time." During that time, Mr. SMITH is allowed access to the concrete and wire mesh cage located behind his cell, which is kept completely empty. While these cages are designed to provide able-bodied persons limited movement, because of Mr. SMITH's need for a wheelchair and his impaired physical condition, he cannot engage in any such activity during the time he is permitted to be in the cage.

58.     Mr. SMITH has severely limited social interactions with other individuals from outside Five Points. He has been allowed one 30-minute monitored phone call each week since 2013, which was reduced to one 15-minute monitored phone call in or about April 2017. Prior to 2017, the 30-minute phone call could only take place on Sundays, when Mr. SMITH's family and friends were unavailable attending services. In 2017, Mr. SMITH has only had occasion to make three-to-four phone calls, and in 2018 he has made none.

59.     Beginning in approximately June 2012 until 2017, Mr. SMITH was allowed limited "out-of-cell time," which lasted a maximum of two hours once per week. During out-of-cell time, Mr. SMITH was placed in a restraint chair in a room to watch a video—usually the same video each time—while he is restrained to a chair by his ankles. Because of hearing problems, Mr. SMITH could not hear the videos. The room in which Mr. SMITH was placed was often cleared of any and all other people, although sometimes another prisoner is present and confined on the other side of the room in a restraint chair. All of these measures are taken notwithstanding Mr. SMITH's inability to stand without support, and his lack of upper body strength. For no stated reason, Mr. SMITH's ability to participate in "out-of-cell time" ceased in or about April 2017.

60.     Although Mr. SMITH requires the use of hearing aids, they are ineffective and constantly fall out of his ears because they are too loose, or require batteries for which he sometimes has to wait days to receive. Therefore, even though Mr. SMITH was permitted to watch a video for up to two-hours once per week, he could not hear that video.

### D.  Mr. SMITH's Physical and Mental Deterioration

61.     Mr. SMITH suffers from multiple medical ailments that are well documented by Five Points' medical staff, and known to the individual Defendants. Surgeons, doctors, and nurses outside Five Points have also seen and treated Mr. SMITH for his many medical concerns. Indeed, John Colvin, then the Deputy Superintendent of Security and now the Superintendent, acknowledged Mr. SMITH's "physical limitations" and advised Mr. SMITH that "Security staff will make provisions to accommodate" those limitations.

62.     As mentioned above, Mr. SMITH is confined to a wheelchair. Mr. SMITH suffers from muscle atrophy in his hands and legs that is further deteriorating due to a medical condition in his spine, making mobility extraordinarily difficult. Mr. SMITH also has lost most of the use of his left leg, thereby making it difficult for him to stand without losing his balance. Mr. SMITH even requires assistance in order to stand momentarily for a pat-frisk when he is transported to and from his cell.

63.     Mr. SMITH is prescribed over 19 medications, including but not limited to: daily aspirin to prevent heart attack and stroke; daily Metamucil for his ulcerative colitis; Lasix; Verapamil for blood pressure; Lopressor for blood pressure; Plavix to prevent a heart attack; Relafen twice daily for pain relief; Flomax every evening for urinary problems; Lipitor daily for cholesterol; Mesalamine twice daily for bowel disease; Prilosec for gastric relief; Allopurinol to reduce uric acid; Ditropan for overactive bladder; Nasacort for sinus relief; Colace for

constipation; Casodex daily for his prostate cancer; and Lidocaine patches to treat Mr. SMITH's pain. Mr. SMITH also used to receive Lupron injections every four months for his prostate cancer, which have ceased.

64.     Mr. SMITH has had surgeries on his neck, both elbows and left foot, which have resulted in their diminished use and an overall weakening in his upper body. Mr. SMITH recently had surgery on the vertebrae in his neck, which caused damage to nearby nerves affecting his neck, left shoulder, arm and hand, and often requires him to wear a neck brace. He has also had the bursar sacs removed from his elbows. As such, Mr. SMITH has great difficulty moving his wheelchair.

65.     Mr. SMITH suffers from seizures, and is required to wear a helmet to prevent any head trauma if and when he falls out of his wheelchair.

66.     Mr. SMITH also has arthritis in both hands as well as carpal tunnel in his wrists.

67.     Mr. SMITH is constantly in pain due to painful sores on his legs, hip, buttocks and feet, which developed because of infections from his Lupron injections and because he is forced by the conditions of his custody to be sedentary at almost all times. His sores require treatment to prevent or treat infection. Invariably, the sores become infected and enhance the pain and discomfort that Mr. SMITH is constantly in.

68.     Because he remains mostly sedentary, Mr. SMITH has required the use of a back brace since around 1990. The brace he was given is too large, however, and continues to cause him discomfort and chafing.

69.     Because of his prolonged and excessive isolation, Mr. SMITH is severely depressed and has persistent feelings of hopelessness. He resorts to talking to himself constantly. Mr. SMITH also suffers from a lack of concentration and forgetfulness.

**E.  Mr. SMITH's Interaction with Others and Social Deprivation**

70.     Mr. SMITH has demonstrated a history of having interactions with females without incident. Mr. SMITH is visited by the facility's medical staff, which includes female nurses and physicians. Mr. SMITH has also encountered female nurses and physicians when he is taken outside the facility for medical examinations and/or procedures. Mr. SMITH has had no incident during his interactions with female medical staff.

71.     In addition to medical personnel, Mr. SMITH is visited from time to time by family members and lawyers. In fact, between 1984 and 2003, Mr. SMITH was visited by friends, family and lawyers and, during those visits, was not kept in restraints. Mr. SMITH has had no incidents in connection with his interactions with these visitors, including his interactions with female visitors.

72.     Mr. SMITH has only been cited for three incidents in the past 25 years, each involving minor infractions, including: one in 2016 for providing his attorneys with information about his confinement; in 2008 for having property in an unauthorized area; and in 2005 for possession of "contraband."

73.     Notwithstanding the aforementioned infractions, the infrequency with which they have occurred, and the minor, non-violent incidents he has been cited for, Mr. SMITH has remained in Ad Seg on the pretext that he poses a threat to the safety of female staff or visitors to the facility.

74.     In fact, and in Defendants' own words, Mr. SMITH's indefinite confinement is punishment well beyond the time he already served and is to continue to serve as a "reminder" to other prisoners and staff.

*F.  Exhaustion of Remedies*

75.     Mr. SMITH has repeatedly and continuously challenged his continued solitary confinement on Ad Seg status by writing letters to Defendants, and filing timely grievances, complaints, and appeals. In fact, in September 2010, through counsel, Mr. SMITH appealed his confinement to then-Commissioner Fischer, and did so again in 2015 to Defendant ANNUCCI. Those appeals directly addressed Mr. SMITH's lack of meaningful review, prolonged and indefinite confinement, and Defendants' constitutional violations. On July 9, 2015, writing on behalf of Defendant ANNUCCI, Defendant BELLNIER denied refusing Mr. SMITH any meaningful review.

76.     Subsequently, on May 5, 2016, Mr. SMITH was advised by Five Points' Inmate Grievance Program that "decisions regarding Ad Seg status are not grievable."

77.     Mr. SMITH's grievance complaints and appeals about his continued Ad Seg status have also been reviewed by the Central Office Review Committee ("CORC").  On or about November 9, 2016, CORC determined that "[Mr. SMITH's] concerns have been appropriately addressed" and "no malfeasance by staff is noted."

78.     To date, Mr. SMITH continues to appeal each and every 60-day review he receives, as well as when he does not receive any review or when reviews are untimely. His grievances, complaints, and appeals are summarily denied or dismissed by the Inmate Grievance Review Committee and Superintendent.

79.     Mr. SMITH has thus exhausted all possible grievances, appeals and administrative remedies heretofore.

## FIRST CLAIM FOR RELIEF

80.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "79" above as though set forth herein.

81.     By their policies and practices described herein, Defendants have deprived and continue to deprive Plaintiff of life's necessities, and have violated his basic human dignity and his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

82.     By their policies and practices described herein, Defendants have subjected plaintiff to severely harmful punitive solitary confinement that gratuitously inflicts unnecessary and wanton pain and suffering without penological justification and Defendants actions fall far short of evolving standards of decency in violation of plaintiff's right to be free from cruel and unusual punishment under the Eight Amendment.

83.     The cumulative effect of extremely prolonged isolated confinement constitutes a serious deprivation of basic human needs, including, but not limited to, normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.

84.     Extremely prolonged exposure to the above-described deprivations of basic human needs is currently imposing serious psychological pain and serious physical injury to Plaintiff resulting in permanent psychological and physical injury to Plaintiff.

85.     The likelihood that Plaintiff will remain in Ad Seg for the foreseeable future subjects him to a significant risk of future debilitating and permanent mental illness and physical harm.

86.     The policies and practices complained of herein have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

87.     Defendants are deliberately indifferent to the substantial and obvious risk of harm caused by their policies and practice of keeping Plaintiff in Ad Seg for an extended period of time.

88.     It should be obvious to Defendants, and to any reasonable person, that the conditions imposed on Plaintiff for many years causes tremendous mental anguish, suffering, and pain. Moreover, Defendants have repeatedly been made aware, through administrative grievances, written complaints, and appeals that Plaintiff is currently experiencing significant and lasting physical and psychological injury. Defendants ignored the allegations set forth in those grievances and complaints and have thus been deliberately indifferent to Plaintiff's pain and suffering.

## SECOND CLAIM FOR RELIEF

89.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "88" above as though set forth herein.

90.     Defendants' policy of indefinite and prolonged isolated confinement imposes disproportionate punishment on plaintiff. Defendants have no legitimate penological interest in retaining plaintiff indefinitely in the debilitating conditions of Ad Seg without recent, serious disciplinary-related infractions.

91.     Defendants' decades-long confinement and infliction of significant psychological and physical harm and the risk of future harm to Plaintiff, who has not committed any serious infraction for over thirty-five years, offends society's sense of decency, constitutes an intolerable practice in modern society, and is a disproportionate punishment that violates the Eighth and Fourteenth Amendments to the United States Constitution.

## THIRD CLAIM FOR RELIEF

92.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "91" above as though set forth herein.

93.     Defendants have deprived Plaintiff of a liberty interest without due process of law by denying him meaningful and timely periodic reviews of his continued long-term and indefinite detention in Ad Seg, and meaningful notice of what he must do to earn release, in violation of the Fourteenth Amendment to the United States Constitution.

94.     Plaintiff has been held in the crushing conditions described above for 37 years. This shockingly lengthy confinement is atypical in comparison to the ordinary isolated confinement imposed in New York and other states.

95.     Because indefinite placement in Ad Seg constitutes a significant and atypical hardship, Plaintiff is entitled to meaningful notice of how he may alter his behavior to rejoin general population or be placed in other less restrictive housing, as well as meaningful and timely periodic reviews to determine whether he still warrants detention in Ad Seg.

96.     Defendants have denied and continue to deny any such notice or meaningful review by: (a) providing misleading notice that he can become eligible to be released from Ad Seg by maintaining "positive" behavior, when in fact Plaintiff has maintained positive behavior and is still housed in Ad Seg; (b) failing to provide Plaintiff with adequate notice of what he can do to get released from Ad Seg; (c) making a predetermination that Plaintiff will stay in Ad Seg, thus rendering the periodic reviews procedurally meaningless; and (d) failing to conduct timely reviews, thus precluding him from responding, participating, or providing additional information and the review committee from conducting meaningful review.

97.     Defendants' actions complained of herein are in violation of the Fourteenth Amendment to the United States Constitution.

## **FOURTH CLAIM FOR RELIEF**

98.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "87" above as though set forth herein.

99.     Defendants have deprived Plaintiff of a protected liberty interest by arbitrarily and capriciously denying him release from Ad Seg, by making a predetermination that he will stay in Ad Seg and rendering the periodic reviews substantively meaningless.

100.    Defendants' acts as complained of herein are in violation of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff LEMUEL SMITH requests that this Court:

   i.    Declare that the acts set forth herein by Defendants are in violation of Plaintiff's rights under the Constitution and laws of the United States;

  ii.    Issue injunctive relief ordering Defendants to release Plaintiff from Administrative Segregation;

 iii.    Enter judgment in favor of Plaintiff for reasonable actual and compensatory, including consequential, damages against each of the Defendants, jointly and severally, to compensate Plaintiff for his pain, suffering, and other hardships arising from Defendants' deliberate indifference to Plaintiff's serious medical needs and violations of his due process rights;

  iv.    Enter judgment for Plaintiff for reasonable punitive damages against each of the Defendants;

   v.    Award Plaintiff the costs of this action, including reasonable attorneys' fees;

  vi.    Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court; and

 vii.    Grant such other and further relief as this court deems just and proper.

Dated:  New York, New York
         March 30, 2018

                                         McLAUGHLIN & STERN, LLP


                                         By:  */s/ Jonathan R. Jeremias*
                                                 Jonathan R. Jeremias
                                                   Steven J. Hyman
                                                     260 Madison Avenue
                                                   New York, New York 10016
                                                   (212) 448-1100
                                                   jjeremias@mclaughlinstern.com
                                                   shyman@mclaughlinstern.com

                                             *Attorneys for Plaintiff Lemuel Smith*